IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CODY GRAHAM,

        Plaintiff,

v.                                              CIVIL ACTION NO.  2:22-cv-00467

JOHNNY WILSON, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendants Sgt. Michael Shaffer, Lt. Andy Mitchell, and Cpl. Seth Summers' Motion for Summary Judgment* (Document 37), *Defendants Sgt. Michael Shaffer, Lt. Andy Mitchell, and Corporal Seth Summers' Memorandum of Law in Support of Motion for Summary Judgment* (Document 38), the *Plaintiff's Memorandum of Fact and Law in Response to Defendants' Motion for Summary Judgment* (Document 41), and *Defendants Sgt. Michael Shaffer, Lt. Andy Mitchell, and Corporal Seth Summers' Reply to Motion for Summary Judgment* (Document 45), as well as all exhibits.

In addition, the Court has reviewed the Plaintiff's *Motion for Leave to Amend Complaint to Conform to the Evidence* (Document 42), the *Memorandum in Support of Plaintiff's Motion for Leave to Amend Complaint to Conform to the Evidence* (Document 43), and the *Defendants' Joint Response in Opposition to Plaintiff's Motion for Leave to Amend Complaint* (Document 46).

**FACTS**

The Plaintiff, Cody Graham, initiated this action with a *Complaint* (Document 1-1) filed in the Kanawha County Circuit Court on June 24, 2022. He named the following Defendants: The West Virginia Division of Corrections and Rehabilitation (since dismissed), Johnny Wilson, Correctional Officer II David Ewing, Corporal Chayse Brown, Corporal Snodgrass, Correctional Officer I Tanner Sears, Sergeant Michael Shaffer, Lt. Mitchell, and Corporal Seth Summers. At the time of the events at issue, Mr. Graham was incarcerated at the Mount Olive Correctional Center (MOCC), and the Defendants were all employees at MOCC.

On August 2, 2020, Mr. Graham sought permission to call his mother for her birthday. He was upset when officers did not allow him to make the call. He drank homemade alcohol, became intoxicated, and began banging on the door of his cell and yelling insults at officers who approached. He refused to cuff up so he could be removed from the cell and the cell could be searched for alcohol. Lt. Mitchell, as the commanding officer during the incident, responded to Mr. Graham's cell. Mr. Graham cursed at him, continued to refuse to comply with orders and beat on his cell door. Defendants Shaffer and Snodgrass approached with Phantom oleoresin capsicum (OC) spray, an aerosol spray designed to fill a cell. Defendant Summers operated a video camera to record the incident. Mr. Graham continued to refuse to comply, and Defendant Shaffer deployed the OC spray. Mr. Graham continued to kick his cell door and yell for a few moments, then began coughing as the impact of the spray took effect. Mr. Graham stripped out when directed to do so, as was typically required for inmates in his unit to exit their cells. He can be heard coughing, choking, and moaning in the video.

Defendants Mitchell and Shaffer repeatedly ordered him to put his underwear back on and cuff up. The video shows him struggling to find the underwear, which, like all of his clothing, were contaminated by the OC spray.[1] He begged to be removed from the cell and placed his hands through the tray slot on multiple occasions, offering to be handcuffed. Mr. Shaffer indicated that policy required inmates in Mr. Graham's unit to be cuffed behind their backs unless they had a medical excuse, and Mr. Graham placed his hands through the slot in front, in addition to failing to comply with the directives to put on his underwear. The video does not depict any officer telling Mr. Graham to turn and place his hands through the slot behind his back. Mr. Shaffer conceded that Mr. Graham was compliant after the OC spray was deployed, other than failing to put on his shorts. Mr. Graham likewise testified that after he was sprayed, he was trying to comply. He stated that he was having difficulty breathing and wanted out of the cell. An August 3, 2020 report, submitted to the Director of Security, indicates that after the OC spray was deployed "staff stayed at the [cell] door for a few minutes and then left. [Mr. Graham] was unsupervised for approximately 18 minutes before anyone returned," contrary to policy. (Aug. 3, 2020 Memo, D. Ames to S. Caudill, at 5) (Document 41-2.)

After the extraction team was convened, Lt. Mitchell approached Mr. Graham's cell and asked whether he would come out. Mr. Graham could still be heard groaning. Only seconds later, without giving any specific directive or opportunity for Mr. Graham to place his hands through the slot to be cuffed, the extraction team entered the cell. Much of the video shows only the feet and/or backs of the team. Within about twenty to thirty seconds, members of the

---

1 The Plaintiff's expert explained that "[t]here was no legitimate reason to require Graham to put on OC contaminated clothing before cuffing him up and removing him from the contaminated cell." (R. Casto Rep. at 2) (Document 41-6.)

3

extraction team stated that Mr. Graham was secured. The video depicts him making clear sounds of distress and repeatedly crying that he was sorry. Members of the extraction team lifted him to his feet, covered him in a blanket, and walked him to a room in the medical unit where he was placed in a chair. He continued to apologize and beg the officers not to hurt him anymore. A member of the medical staff wiped his eyes and nose with gauze pads, indicating that she was trying to wipe away blood, and did a medical assessment. Medical staff concluded that he needed additional care for an arm injury. The officers dressed him, then later switched to a different outfit for transport, which appeared to cause him significant pain as his arm was manipulated to change shirts and take handcuffs on and off. He was ultimately transported to a hospital for medical care, without being given the opportunity to shower or fully decontaminate from the OC spray. He stated that he suffered a fractured right humerus, which required surgical repair and left an extensive scar, a T1-T2 spine fracture, a left rib fracture, a para-orbital contusion, head trauma, facial trauma, blurry vision, and nerve damage to his arm and hand that continues today.

Mr. Graham asserts claims for Intentional Infliction of Emotional Distress/Outrageous Conduct, and for Violation of 42 USC § 1983/Excessive Force/Cruel and Unusual Punishment as to all Defendants. His proposed amended complaint adds a claim for Violation of 42 USC § 1983: Deliberate Indifference – Failure to Intervene.

## AMENDMENT

The Plaintiff seeks to file an amended complaint to conform to the evidence. The proposed amended complaint adds the factual allegation that the Defendants failed to decontaminate Mr. Graham from the OC spray and adds a claim for deliberate indifference and failure to intervene. It also adds more detailed information about each Defendant's specific role

during the incident. The Plaintiff argues that motions to amend are to be freely granted, and that the amendment will not prejudice the Defendants. He emphasizes that the proposed amendments are designed to provide additional clarity and to conform the pleading to the evidence developed during discovery.

The Defendants oppose the motion to amend, arguing that it is untimely and that they would suffer undue prejudice. They note that discovery has closed, and the proposed amendment adds a new cause of action as well as additional factual claims. They suggest that they would need an expert related to the failure to decontaminate claim. Finally, they argue that amendment would be futile because the Plaintiff admits that the use of the OC spray was justified.

Motions to amend pleadings after expiration of the applicable deadline in the scheduling order are governed by Rule 16(b)'s good cause standard. *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008). The good cause analysis is based primarily on the diligence and justifications of the party seeking the extension, although the potential for prejudice to the non-moving party is also considered. *W. Virginia Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 566 (S.D. W. Va. 2001) (Haden, C.J.).

The Court finds that the Plaintiff has set forth good cause for the modest amendment proposed herein. It is not unusual for facts developed during the discovery process to alter the precise causes of action or bases for certain claims. Here, following discovery, the Plaintiff seeks to remove allegations that the use of OC spray was improper, but add allegations that the failure to properly decontaminate him violated his rights. This adjustment appears related to the facts developed through depositions and the Plaintiff's expert report. The newly added claim for deliberate indifference and failure to intervene likewise relates to facts developed in discovery as

5

each officer's precise role in the incident became clear. The updated complaint better reflects the facts at this stage of proceedings, but the original complaint placed the Defendants on notice that the entirety of the incident involving Mr. Graham on August 2, 2020, would be at issue.[2] Therefore, the motion to amend should be granted.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light

---

[2] The trial date has been continued on other grounds. The Defendants are free to file a motion or reach a stipulation with the Plaintiff to permit any discovery required by this ruling.

most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

Defendants Shaffer, Mitchell, and Summers argue that they are entitled to summary judgment because the facts developed in discovery do not support the claims asserted against them. They note that it is undisputed that this incident began because the Plaintiff was intoxicated and noncompliant, and the Plaintiff concedes that the use of OC spray was justified. Thus, they

7

contend that Sgt. Shaffer should be dismissed because he is implicated only as the officer who deployed the OC spray. Lt. Mitchell contends that vicarious liability is the only potential basis of the claims against him and urges summary judgment in his favor as to Count II, for violations of the Eighth Amendment, because § 1983 does not permit vicarious liability claims. The Defendants further argue that they are entitled to qualified immunity because the Plaintiff has not shown that their actions were not made in good faith for the purpose of restoring order. They contend that Corporal Summers, as the camera operator, did not engage in any use of force at all, and cannot be held liable for poor camera operation. In addition, they contend that Lt. Mitchell cannot be liable for excessive force because he did not directly use force against the Plaintiff, and the force used by officers under his supervision was reasonable. Finally, the Defendants argue that the Plaintiff cannot show that their conduct meets the standard for IIED claims under West Virginia law, and they are entitled to summary judgment on that claim as well.

  The Plaintiff contends that genuine disputes of material fact preclude summary judgment in this case. He argues that he has presented evidence that Defendants Shaffer, Mitchell, and Summers all failed to decontaminate Mr. Graham after his cell was sprayed with the OC spray, and that precedent establishes that failure to decontaminate can constitute an Eighth Amendment violation. In addition, he contends that leaving him in the contaminated cell for an extended period and calling for an extraction team violated his Eighth Amendment rights, citing evidence that he was surrendering and ready to be handcuffed and removed from the cell without additional force. He argues that these Defendants failed to intervene both in leaving him in a contaminated cell unnecessarily and failing to decontaminate him, and, as to Defendants Mitchell and Summers, in the beating he suffered at the hands of the extraction team. Finally, he contends that the facts,

viewed in the light most favorable to him, are sufficient to support a claim for intentional infliction of emotional distress.

The Defendants argue in reply that the Plaintiff's arguments address claims that were not set forth in his original complaint.

### A. Eighth Amendment

"Excessive force claims brought by convicted prisoners are governed by the Eighth Amendment's prohibition against cruel and unusual punishment." *Fraley v. Davis*, No. 21-6641, 2022 WL 3210702, at *1 (4th Cir. Aug. 9, 2022) (unpublished). The Supreme Court has recognized that prison officials must retain the ability to act quickly when necessary to restore and maintain order. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). Thus, "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is…whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* The Fourth Circuit has summarized the factors courts consider to determine whether force was applied in good faith or with the intent to cause harm:

1. The need for the application of force;
2. The relationship between the need and the amount of force that was used;
3. The extent of any reasonably perceived threat that the application of force was intended to quell; and
4. Any efforts made to temper the severity of a forceful response.

*Fraley*, 2022 WL 3210702, at *1–2 (describing the *Whitley* factors, derived from *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties. *See, e.g., Pearson v. Callahan*, 555

9

U.S. 223, 231–32 (2009). Defendants asserting a qualified immunity defense first bear the burden of "demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (internal quotation marks omitted.) The defense of qualified immunity is available unless the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff…." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (internal emphases omitted). Officials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right. *Pearson*, 555 U.S. at 231–32. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (internal quotation marks and citations omitted).

There is no dispute here that the Plaintiff was intoxicated and causing a disturbance in his cell on August 2, 2020. He refused to comply with orders when officers tried to remove him from the cell to conduct a search and confiscate the alcohol. The Plaintiff and the Plaintiff's expert agree that the use of OC spray was justified. The parties' interpretation of the evidence diverges after that point. Viewing the evidence in the light most favorable to the Plaintiff, he ceased his noncompliance after the OC spray was deployed. He was intoxicated and struggled to see and breathe because of the OC spray, which made him unable to find and put on his contaminated underwear when officers ordered him to do so. Mr. Graham and Mr. Shaffer both testified, and the video confirms, that he put his hands through the tray slot to be handcuffed. Although Defendants Shaffer and Summers testified that cuffing him in front would have violated policy,

Mr. Graham indicated that officers did not consistently follow or enforce the policies related to removing inmates from cells, and the video does not show any officer giving him a directive to turn and put his hands through the slot behind his back. The Plaintiff's expert also indicated that there was no reason he could not have been secured and removed from the cell when he offered his hands to be cuffed.

Leaving Mr. Graham in the contaminated cell and failing to decontaminate him even after he was removed can constitute an Eighth Amendment violation. *See*, *Saunders v. Burton*, No. CV 5:21-00322, 2022 WL 8299859, at *16 (S.D.W. Va. June 17, 2022) (Aboulhosn, M.J.), *report and recommendation adopted*, No. 5:21-CV-00322, 2022 WL 4484012 (S.D.W. Va. Sept. 27, 2022) (collecting cases). Deploying an extraction team unnecessarily, when Mr. Graham was trying to surrender to be taken into custody without requiring any additional use of force, fits the *Whitley* factors for force that violates the Eighth Amendment. A factfinder could conclude that the force was unnecessary, that it was excessive under the circumstances, that the threat requiring any use of force had been quelled with the OC spray, and that the officers made no effort to temper the severity of their response. Defendants Mitchell and Shaffer were present and involved in making the decisions to leave Mr. Graham in his contaminated cell, call the extraction team rather than simply cuffing him and removing him, and failing to decontaminate him. Defendant Summers was also present throughout, and a reasonable jury could find that he acted in concert with the other Defendants (including those on the extraction team who did not move for summary judgment) by ensuring that the video would not provide a record of cell extraction.

The law surrounding excessive force in this context is clearly established, and the Defendants admitted in their depositions that they understood that it would be a violation if they

failed to decontaminate Mr. Graham or used force against a compliant inmate. If a jury credits the evidence put forth by the Plaintiff, the Defendants would not be entitled to qualified immunity. If a jury resolves factual disputes and draws inferences in the Plaintiff's favor, it could find that these Defendants violated the Plaintiff's clearly established constitutional right to be free of excessive force, deployed for the purpose of causing pain. Therefore, the motion for summary judgment as to the Eighth Amendment claim is denied.[3]

### B. Intentional Infliction of Emotional Distress

The West Virginia Supreme Court has established the following elements for outrage claims, also called intentional infliction of emotional distress:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 421 (W. Va. 1998) (reaffirmed in *Hatfield v. Health Mgmt. Associates of W. Virginia*, 672 S.E.2d 395, 404 (W. Va. 2008).

Courts must determine whether the conduct "may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress." Syl. pt. 12, *Zsigray v. Langman*, 842 S.E.2d 716, 718 (W. Va. 2020). "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous

---

[3] As noted, the Plaintiff concedes that the use of OC spray was justified, and the Defendants would be entitled to summary judgment as to any claim based solely on the deployment of OC spray. However, given the Court's conclusion that he should be permitted to amend his complaint to conform to the evidence, the Court has considered the evidentiary support for the Eighth Amendment claim more broadly.

12

is a question for jury determination." *Id.* "It is difficult to overstate the high burden of proof required to sustain a tort claim for intentional infliction of emotional distress." *Pegg v. Herrnberger*, 845 F.3d 112, 122 (4th Cir. 2017). It only covers conduct "so outrageous in character, so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Keyes v. Keyes*, 193 S.E.2d 693, 696 (W. Va. 1990) (quoting *Harless v. First Nat'l Bank*, 289 S.E.2d 692, 703–04 n.20 (W. Va. 1982)).

The parties agree that the Plaintiff was justifiably sprayed with OC spray after being disruptive. The Plaintiff has presented evidence that he was compliant thereafter, although he remained heavily impaired by alcohol and the impact of the OC spray. Instead of taking him into custody and removing him from his cell when he put his hands through the tray slot, the Defendants left him in his cell without any staff at hand for approximately 18 minutes, then called in an extraction team. Drawing inferences in the Plaintiff's favor, Defendant Summers ensured that the video showed little of the incident. The extraction team, assembled, observed, and supervised by these Defendants, used so much force that Mr. Graham—who was compliant at the time the extraction team entered his cell—was left with a broken arm that required surgical repair with a rod and screws, T1-T2 spine fractures, a left rib fracture, periorbital contusion, subconjunctival hemorrhage, blurry vision, and nerve damage. The Defendants then failed to decontaminate Mr. Graham at any point while moving him to the medical unit, having him examined by a nurse, dressing him, changing his clothes, and awaiting the arrival of the ambulance with him. This case is distinct from cases involving "minor abuse of law enforcement authority" that rise only to "threats or petty oppressions" and do not constitute "extreme and outrageous conduct." *Weigle*

13

*v. Pifer*, 139 F. Supp. 3d 760, 778 (S.D. W. Va. 2015) (Copenhaver, J.). The Court finds that the conduct described by the Plaintiff could legally constitute intentional infliction of emotional distress under West Virginia law, and the motion for summary judgment must therefore be denied.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the Plaintiff's *Motion for Leave to Amend Complaint to Conform to the Evidence* (Document 42) be **GRANTED** and that the proposed *Amended Complaint* (Document 42-1) be **FILED**. The Court further **ORDERS** that *Defendants Sgt. Michael Shaffer, Lt. Andy Mitchell, and Cpl. Seth Summers' Motion for Summary Judgment* (Document 37) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: December 12, 2023

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

14